# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

Estate of Donald Maier,
by Personal Representative Jeannette Maier, and
Jeanette Maier,

                Plaintiffs,

            v.                      Case No.

Secretary of Wisconsin Department of Corrections
Jared Hoy, in his official capacity,
and
Randall Hepp, Bradley Mlodzik,
Yana Pusich, Kelsey Stone,
Michael Lueneburg, Joel Sankey,
Jenny Vaillancourt, Bradley Lewin,
Ernesto Martinez, Carlee Martin,
Nathan Shreve, Dustin Wiltgen,
Scott Kinnard, Melissa Tempski,
Jamall Russell, Maria Gomez-Sena,
Sarah Ann Ransbottom, Kayla Meedema,
John Hollfelder, Jessica Hosfelt,
Devyn Urban, Aimee Marshall,
Eric Henrichs, Lajuan Lewis,
Brian Taplin, Jaime Engstrom,
Aaron Arzenhofer, Brandon Fisher,
Guillermo Avila, Leopoldo Escorza,
Dustin Fay, Robert McGuinness,
Karisa Smits, and Jeramie Chalker,

                Each in his or her individual capacity,

                Defendants

---

# **COMPLAINT**

---

## I. NATURE OF ACTION

101. This is a civil action brought pursuant to 42 U.S.C. § 1983 and the Rehabilitation Act in order to obtain compensatory and punitive damages for the wrongful death of Donald Maier, which was caused by the Defendants' lack of accommodation, deliberate indifference, and negligence in ignoring his rapidly and obviously deteriorating physical and mental health while he was in their care.

## II. JURISDICTION AND VENUE

201. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343(a)(3) (42 U.S.C. § 1983 jurisdiction).

202. The Court has jurisdiction over the supplemental state-law claims pursuant to 28 U.S.C. § 1367.

203. The Eastern District of Wisconsin is the proper venue for this action because the Plaintiffs' claims arose within the geographical boundaries of Dodge County which is in the Eastern District of Wisconsin within the meaning of 28 U.S.C. § 1391(b).

## III.   PARTIES

### A.   Plaintiffs

301.   Plaintiff Estate of Donald Maier is a legal entity that has the capacity to sue and be sued and has a court-appointed personal representative, Jeannette Maier.

302.   Plaintiff Jeannette Maier is an adult resident of Wisconsin.

303.   She is the mother of Donald Maier, who is deceased.

### B.   Defendants

304.   Jared Hoy is an adult resident of Wisconsin.

305.   During the time of the conduct complained of herein, he served as the Secretary of the Wisconsin Department of Corrections (DOC), and he is still serving in that capacity at the present time.

306.   On information and belief, Randall Hepp is an adult resident of Wisconsin.

307.   During February, 2024, Defendant Hepp was employed by the DOC as the Warden of Waupun Correctional Institution (WCI).

308.   On information and belief, Bradley Mlodzik is an adult resident of Wisconsin.

309.   During February, 2024, Defendant Mlodzik was employed by the DOC as the Deputy Warden of WCI.

310. On information and belief, Yana Pusich is an adult resident of Wisconsin.

311. In February, 2024, Defendant Pusich was employed by the DOC as Security Director of WCI.

312. On information and belief, Kelsey Stone is an adult resident of Wisconsin.

313. In February, 2024, Defendant Stone was employed by the DOC as a correctional lieutenant and shift supervisor at WCI.

314. On information and belief, Michael Lueneburg is an adult resident of Wisconsin.

315. During February, 2024, Defendant Lueneburg was employed by the DOC as a correctional officer, working on the Restrictive Housing Unit (RHU) at WCI.

316. On information and belief, Joel Sankey is an adult resident of Wisconsin.

317. During February, 2024, Defendant Sankey was employed by the DOC as a correctional captain, working on RHU at WCI as a shift commander.

318. On information and belief, Jenny Vaillancourt is an adult resident of Wisconsin.

4

319. During February, 2024, Defendant Vaillancourt was employed by the DOC as a correctional officer, working on RHU at WCI.

320. On information and belief, Bradley Lewin is an adult resident of Wisconsin.

321. During February, 2024, Defendant Lewin was employed by the DOC as a correctional lieutenant, working on RHU at WCI.

322. On information and belief, Ernesto Martinez is an adult resident of Wisconsin.

323. During February, 2024, Defendant Martinez was employed by the DOC as a correctional officer, working on RHU at WCI.

324. On information and belief, Carlee Martin is an adult resident of Wisconsin.

325. During February, 2024, Defendant Martin was employed by the DOC as a correctional officer, working on RHU at WCI.

326. On information and belief, Nathan Shreve is an adult resident of Wisconsin.

327. During February, 2024, Defendant Shreve was employed by the DOC as a correctional officer, working on RHU at WCI.

328. On information and belief, Dustin Wiltgen is an adult resident of Wisconsin.

5

329. During February, 2024, Defendant Wiltgen was employed by the DOC as a correctional sergeant, working on RHU at WCI.

330. On information and belief, Scott Kinnard is an adult resident of Wisconsin.

331. During February, 2024, Defendant Kinnard was employed by the DOC as a correctional captain, working on RHU at WCI.

332. On information and belief, Melissa Tempski is an adult resident of Wisconsin.

333. During February, 2024, Defendant Tempski was employed by the DOC as a correctional sergeant, working on RHU at WCI.

334. On information and belief, Jamall Russell is an adult resident of Wisconsin.

335. During February, 2024, Defendant Russell was employed by the DOC as a correctional officer, working on RHU at WCI.

336. On information and belief, Maria Gomez-Sena is an adult resident of Wisconsin.

337. During February, 2024, Defendant Gomez-Sena was employed by the DOC as a correctional officer, working on RHU at WCI.

338. On information and belief, Sarah Ann Ransbottom is an adult resident of Wisconsin.

6

339. During February, 2024, Defendant Ransbottom was employed by the DOC as a correctional officer, working on RHU at WCI.

340. On information and belief, Kayla Meedema is an adult resident of Wisconsin.

341. During February, 2024, Defendant Meedema was employed by the DOC as a physician, working at WCI.

342. On information and belief, John Hollfelder is an adult resident of Wisconsin.

343. During February, 2024, Defendant Hollfelder was employed by the DOC as a sergeant, working on RHU at WCI.

344. On information and belief, Jessica Hosfelt is an adult resident of Wisconsin.

345. During February, 2024, Defendant Hosfelt was employed by the DOC as a nurse working for its Health Services Unit (HSU).

346. On information and belief, Devyn Urban is an adult resident of Wisconsin.

347. During February, 2024, Defendant Urban was employed by the DOC as a correctional officer, working on RHU at WCI.

348. On information and belief, Aimee Marshall is an adult resident of Wisconsin.

349.    During February, 2024, Defendant Marshall was employed by the DOC as a correctional sergeant

350.    On information and belief, Eric Henrichs is an adult resident of Wisconsin.

351.    During February, 2024, Defendant Henrichs was employed by the DOC as a correctional lieutenant, working on RHU at WCI.

352.    On information and belief, Lajuan Lewis is an adult resident of Wisconsin.

353.    During February, 2024, Defendant Lewis was employed by the DOC as a correctional officer, working on RHU at WCI.

354.    On information and belief, Brian Taplin is an adult resident of Wisconsin.

355.    During February, 2024, Defendant Taplin was employed by the DOC as a nurse working for its Health Services Unit (HSU).

356.    On information and belief, Jaime Engstrom is an adult resident of Wisconsin.

357.    During February, 2024, Defendant Engstrom was employed by the DOC as a psychologist working for its Psychological Services Unit (PSU).

358.    On information and belief, Aaron Arzenhofer is an adult resident of Wisconsin.

8

359.     During February, 2024, Defendant Arzenhofer was employed by the DOC as a correctional sergeant, working on RHU at WCI.

360.     On information and belief, Brandon Fisher is an adult resident of Wisconsin.

361.     During February, 2024, Defendant Fisher was employed by the DOC as a correctional lieutenant, working on RHU at WCI.

362.     On information and belief, Guillermo Avila is an adult resident of Wisconsin.

363.     During February, 2024, Defendant Avila was employed by the DOC as a correctional officer, working on RHU at WCI.

364.     On information and belief, Leopoldo Escorza is an adult resident of Wisconsin.

365.     During February, 2024, Defendant Escorza was employed by the DOC as a correctional officer, working on RHU at WCI.

366.     On information and belief, Dustin Fay is an adult resident of Wisconsin.

367.     During February, 2024, Defendant Fay was employed by the DOC as a correctional officer, working on RHU at WCI.

368.     On information and belief, Robert McGuinness is an adult resident of Wisconsin.

9

369.    During February, 2024, Defendant McGuiness was employed by the DOC as a correctional officer, working on RHU at WCI.

370.    On information and belief, Karisa Smits is an adult resident of Wisconsin.

371.    During February, 2024, Defendant Smits was employed by the DOC as a social worker, working at WCI.

372.    On information and belief, Jeramie Chalker is an adult resident of Wisconsin.

373.    During February, 2024, Defendant Chalker was employed by the DOC as a sergeant, working on RHU at WCI.

374.    At all times relevant to this action, in regard to the conduct complained of herein, each individual Defendant was acting within the scope of his or her employment within the meaning of §895.46 Wis. Stats.

375.    At all times relevant to this action, in regard to the conduct complained of herein, each individual Defendant was acting under color of state law within the meaning of 42 U. S. C. § 1983.

10

## IV.   ALLEGATIONS OF FACT AS TO ALL CAUSES OF ACTION

4001. Donald Maier was admitted to the Wisconsin Prison System on June 18, 2012, as a result of having been sentenced to a total of fifteen years in Wood County Case 2011CF478.

4002. While in prison, Mr. Maier manifested many symptoms of mental illness.

4003. He was designated as Mental Health Code MH-2A by the Wisconsin Department of Corrections ("DOC").

4004. An inmate who is designated MH-2A has a current diagnosis of, or is in remission from, a serious mental illness such as schizophrenia, a major depressive disorder, or a bipolar disorder.

4005. Since at least 2017, Donald Maier was diagnosed as suffering from delusional disorder, persecutory type, and depression, with a history of suicidal ideation.

4006.  Delusional Disorder, previously called paranoid disorder, is a psychotic disorder, meaning it is a major mental illness, and persecutory delusional disorder is a type of psychosis, the sufferers of which have an unfounded belief that others are trying to harm them.

4007.  Symptoms of delusional disorder include belief that someone or something is mistreating, spying on, or attempting to harm them; making repeated complaints to legal authorities; experiencing extreme paranoia and fear; withdrawal from ordinary life; and experiencing emotional distress such as irritability, anger, and resentment.

4008.  Donald Maier also suffered from coronary artery disease, hypertension, and dyslipidemia.

4009.  In 2020, he received a cardiac catheterization due to blocked arteries.

4010.  In November, 2019, Maier was transferred to the Wisconsin Resource Center, the DOC facility that is reserved for prison inmates who are in need of specialized mental health treatment.

4011. He remained at Wisconsin Resource Center until February, 2022, when he was transferred to Racine Correctional Institution, a medium security prison.

4012.  In January, 2022, at time of his discharge from Wisconsin Resource Center, Mr. Maier was receiving the following medications: Aspirin 81 mg (prescribed to prevent heart attack or stroke), Atorvastatin (prescribed for high cholesterol), Clonazepam (prescribed to relieve anxiety and relax tense muscles),

12

Clopidogrel (prescribed to prevent blood clots), Gabapentin (prescribed to reduce nerve pain and control restless leg syndrome), Lurasidone (known as Latuda, an anti-psychotic medication, prescribed for psychosis and for bipolar depression), Pantoprazole (used to treat GERD), MiraLax, Ropinirole (prescribed to treat the neurological disorder known as restless leg syndrome), Lyrica (prescribed to treat nerve pain); Sertraline(known as Zoloft, prescribed to treat depression), Metoprolol (prescribed for hypertension); and Nitroglycerin SL (prescribed to treat episodes of angina).

4012. Shortly after his arrival at Racine Correctional, Mr. Maier discontinued his psychotropic medications (Lurasidone and Sertraline), saying he did not need them.

4013. Although he had seemed relatively calm and stable at Wisconsin Resource Center, after he went off his meds at Racine Correctional, Mr. Maier began to decompensate, manifesting increased agitation and delusional thinking.

4014. On October 5, 2022, he was again transferred to Wisconsin Resource Center for treatment of and medication for his delusional disorder.

4015. Maier was transferred from Wisconsin Resource Center to Waupun Correctional Institution ("WCI") on December 4, 2023.

4016. When he was received at WCI, Donald Maier was housed in the Behavioral Health Unit ("BHU"), a unit reserved for those inmates who suffer from mental illness.

4017. From at least December, 2023, until the time of his death, Donald Maier was an "individual with a disability" as that term is defined in 29 USC § 705(20) and 42 USC § 12102 because his mental illness substantially impaired the major life activities of thinking rationally, communicating with others, and taking care of himself.

4018. On February 13, 2025, Donald Maier was found to be lying on the floor of his cell on BHU, unresponsive.

4019. Lieutenant Kelsey Stone effected a cell entry and began to transport the unresponsive Maier to the Health Services Unit (HSU) for examination and evaluation of his condition.

4020. While Mr. Maier was being transported, he became alert and resistive, kicking out at the staff who were transporting him; in response, Lt. Stone tased Maier once in order to gain compliance and continue the transport.

4021. Instead of continuing on to HSU for an evaluation, as originally planned, Lt. Stone redirected Mr. Maier to the Restrictive Housing Unit (RHU) and then left the RHU without having Maier examined or evaluated by HSU

14

staff, thus disregarding Maier's medical and psychiatric needs which had been manifest in Maier's earlier behavior in his cell.

4022. Donald Maier was placed on Alpha Range, upper level, in Cell A227.

4023. From that date (February 13, 2024) until after his death nine days later (February 22, 2024), Maier never left that cell, and no one ever entered the cell to provide him with care or an in-person evaluation.

4024. Restrictive housing is used to separate inmates from the general population due to disruptive behavior, rule violations, or when staff determine a person poses a threat to himself, others, or the facility.

4025. Restrictive housing is a form of isolation, sometimes called solitary confinement, often referred to by inmates as "the hole."

4026. Restrictive housing holds both inmates who are undergoing disciplinary separation, as a punishment for a violation of prison rules, and administrative confinement, a theoretically non-punitive placement for individuals who pose a threat to themselves or others, often as a result of a mental illness.

4027. An inmate who is housed in the general population of the prison is allowed to leave his cell during approved daytime hours, generally takes meals with other inmates in a mess hall, can watch television or visit with other

inmates in a common room on his cell block, and as scheduled, goes to work assignments within the prison, to recreation, and to the library.

4028. In contrast, while placed in restrictive housing, an inmate is confined to his cell; his meals are delivered through a slot in the door to his cell.

4029. Placement in solitary confinement of restrictive housing removes an inmate from almost all meaningful human contact.

4030. Such isolation is known to have a negative impact on an inmate's mental health.

4031. RHU is 180-bed unit that is divided into three "ranges;" each range has an upper and lower level.

4032. Each level has approximately thirty single person cells, fifteen on each side of a middle aisle.

4033. There is always a Range Officer (a Correctional Officer) assigned to be on duty on each range to oversee the safety and security of the inmates and staff.

4034. Donald Maier spent nine days in Cell A227 on the Restricted Housing Unit, and during that time, although he had severe mental and medical

16

concerns that were well documented, he received no medication for his documented medical concerns or for his mental illness.

4035. During his stay on RHU, Mr. Maier was at times heard growling and roaring like an animal.

4036. When he was first placed on the RHU, Mr. Maier was on Observation Status, meaning there was a concern that he was suicidal.

4037. On Observation Status, Mr. Maier was denied all regular clothing and property and was dressed only in a suicide-preventative smock, sometimes called a "turtle suit."

4038. On Observation Status, he was checked every fifteen minutes, and a log was kept memorializing each check.

4039. Mr. Maier did not, however, receive any face-to-face mental health intervention during his nine days on RHU.

4040. In the late night hours of February 15-16, 2024, Donald Maier flooded his cell.

4041. On February 16, 2024, at about 0045, C.O. Michael Lueneburg requested that water be shut off to Maier's cell, and the water was shut off from the staff control location on the RHU, called the Bubble.

4042. It is not uncommon for inmates on RHU to flood their cells, and it is not uncommon for the staff to turn off the water to the cell in response.

17

4043. The DOC had a protocol for water shut-off, which required the authorization of a lieutenant or other "white shirt," required an incident report to be prepared, and, if an inmate's water was shut off for more than two hours, required a nurse or HSU to be advised, the security director to be advised, and a Water Log started, in which the staff memorialized that drinking water was offered to the inmate and at what times.

4044. The purpose of the water shut-off protocol is to ensure that all relevant staff are aware that an inmate is temporarily unable to access water on his own so that the inmate will be provided sufficient drinking water.

4045. Over the ensuing days, the water to Maier's cell was turned on briefly and then off again several times.

4046. However, even when it was on, Mr. Maier was never informed that it had been turned back on.

4047. The water shut-off protocols were never followed.

4048. On February 16, 2024, C.O. Lueneburg ignored the water shut-off protocol in that he did not document the water shut-off, or advise a nurse or HSU, or advise the security director, or prepare an incident report to document the shut-off, or instruct other correctional staff to offer drinking water to Mr. Maier, or offer drinking water to Mr. Maier himself.

4049. On February 16, 2024, Captain Joel Sankey was working as the shift commander on Alpha Range of RHU.

4050. On February 16, 2024, Captain Sankey checked on Mr. Maier at 00:45 and again at 02:10, and he also ignored the water shut-off protocol, as he did not document the water shut-off, did not advise a nurse or HSU, did not advise the security director, did not prepare an incident report, and did not instruct correctional staff to offer drinking water to Mr. Maier and to memorialize times when water was offered and did not himself offer any water to Maier to drink.

4051. On February 16, 2024, at 06:22, Sergeant Melissa Tempski observed Mr. Maier, and he asked her for some water to drink.

4052. Sergeant Tempski moved on without giving Maier any water.

4053. On February 16, 2024, at around 09:25, Dr. Casey Roca spoke to Mr. Maier through the slot in his cell and authorized that Maier be removed from observation status and that he be permitted articles of clothing and some articles of his property, including a mattress instead of the thin sleeping mat which he had been allowed while on observation.

4054. Mr. Maier refused to accept clothing or any of the property to which he was entitled.

19

4055. This was a very unusual response and an indicator that something was wrong with Mr. Maier, as inmates being released from observation status are generally very anxious to return to wearing regular clothes instead of the "turtle suit" and to have the comfort of a mattress to sleep on and to have their toiletries and other items of property returned to them.

4056. Maier told Dr. Roca that he wanted water, saying he wanted "water, water, water, all the water in the world."

4057. Dr. Roca did not respond to this request but "redirected" the conversation; she passed this request on to the correctional staff but did nothing to follow through in an effort to understand why Mr. Maier was so fixated on a need for water or to ensure that Mr. Maier would receive any water to drink.

4058. Later that same day, other correctional staff noticed Maier engaging in unusual behaviors such as drinking from the toilet, acting like he was swimming in his cell, speaking incoherently, and repeatedly saying he wanted water, but no staff responded.

4059. On February 17, 2024, at 08:18, the water to Donald Maier's cell was turned back on, but no one informed Mr. Maier.

4060. That same day, at 15:11 and 15:54, Maier was still asking correctional staff for water.

20

4061. On February 17, 2024, Correctional Officer Jenny Vaillancourt was the acting sergeant on Alpha Range.

4062.  At 16:03, on February 17, 2024, she ordered the water to Maier's cell shut off again, due to flooding.

4063.  C.O. Vaillancourt disregarded the water shut-off protocol in that she did not receive advance approval from a shift commander before ordering the water to be turned off, did not prepare an incident report, did not notify HSU, did not advise security, did not advise other CO's to offer drinking water to Mr. Maier, and did not herself offer him any drinking water.

4064. Throughout the afternoon and evening of February 17, 2024, Mr. Maier could be heard calling out for water.

4065.  On February 17, 2024, at 16:51, Bradley Lewin, who was a lieutenant assigned to RHU, was made aware that Mr. Maier's water had been shut off and that Mr. Maier was begging for water, but ignored the water shut-off protocol as he did not document the water shut-off or prepare an incident report or Water Log or order correctional officers to offer drinking water to Mr. Maier.

4066. The water was turned back on briefly, then turned off again at 17:34.

4067.  On February 17, 2024, at 17:34 hours, Correctional Officer Ernesto Martinez, ordered that Mr. Maier's water be turned on briefly and then ordered it shut off.

4068. C.O. Martinez did not inform Mr. Maier when the water was turned on.

4069. C.O. Martinez also ignored the water shut-off protocol as he did not document the water shut-off, or prepare an incident report, or notify HSU, or notify a supervisor, or offer drinking water to Mr. Maier.

4070. At 19:35, Maier again called out, asking for water to drink.

4071. Captain Shankey was the shift supervisor on February 17, 2024, and when C.O. Vaillancourt eventually informed him of the water shut-off, he ordered the water turned back on, but did not notify Mr. Maier that his water was working again and did not order or create a log entry or incident report to memorialize the incident.

4072. Throughout the night of February 17-18, 2024, Corrections Officer Carlee Martin shut off the water to Maier's cell several times and turned it on again several times.

4073. When she turned the water back on, C.O. Martin did not inform Mr. Maier that it was back on.

4074. When she turned the water off, C.O. Martin did not follow the water shut-off protocol.

4075.  On February 18, 2024, at about 00:28, C.O. Nathan Shreve requested the water in Maier's cell be turned off, and C.O. Martin, working in the Bubble, turned it off.

4076.  Both C.O. Shreve and C.O. Martin ignored the water shut-off protocol: neither obtained preapproval from a shift supervisor, nor did they document the water shut-off, advise HSU, advise the security director, prepare an incident report to document the shut-off, nor did they instructed other correctional staff to offer drinking water to Mr. Maier, and they themselves did not offer drinking water to Mr. Maier.

4077.  C.O. Shreve did inform Sgt. Dustin Wiltgen of the water shut-off, and Sgt. Wiltgen informed shift commander Captain Shankey but both otherwise disregarded the mandates of the water shut-off protocol.

4078.  Capt. Sankey told Sgt. Wiltgen to turn the water back on, but did not order him to notify Maier that it was on and neither he nor Sgt. Wiltgen documented the previous water shut off.

4079.  C.O. Jamal Russell initialed paperwork indicating that he had, on February 18, 2024, completed the 08:30, 09:00, 0930, 10:00, 12:00, 12:30, and 13:30 rounds on RHU, but he had not completed rounds at any of those times.

4080.  On the February 19, 2024, C.O. Russell initialed that he had completed the 07:00, 08:00, 09:00, 09:30, 1030, 11:00, and 13:30 rounds, but he did not make rounds at any of those time.

4081.  Also, although it was his job to deliver meals to the inmates on Alpha Range, C.O. Russell did not deliver a meal tray to Mr. Maier's cell for breakfast or for lunch on February 18, 19, 20, and 21.

4082.  On each of those dates, C.O. Russell also did not ask Mr. Maier if he wanted a meal.

4083.  Although C.O. Russell was aware that Mr. Maier was not eating, he failed to follow the "hunger strike" protocol which required staff who are aware that an inmate has missed three meals to notify HSU which will then perform a baseline assessment, checking the inmate's vital signs and weight, and then continue to assess the inmate's condition daily.

4084.  On February 19, 2024, Captain Scott Kinnard, Sergeant Melissa Tempski, and Correctional Officers Jamall Russell and Maria Gomez-Sena each observed notable deterioration in Donald Maier's condition through the window to his cell, but none initiated any intervention on his behalf.

4085. On February 19, 2024, C.O. Sarah Ann Ransbottom made rounds on Alpha Range and saw the deterioration that Maier was experiencing; she ignored his obvious desperate plight.

24

4086. On February 20, 2024 C.O. Ransbottom falsified records when she initialed a document to indicate that she had completed the 04:00 and 04:30 rounds on RHU; she did not make those rounds.

4087. On the morning of February 20, 2024, Nurse Jessica Hosfelt was working on RHU and was on Alpha Range.

4088. She was approached at approximately 10:18 a.m. by Corrections Officer Russell who told her that he was concerned because Donald Maier had not eaten for two days and was drinking out of the toilet.

4089. Although a nurse in Ms. Hosfelt's situation has a duty, at a minimum, to memorialize concerns such as those that were voiced by C.O. Russell on February 20, 2024, by making a note in the inmate's chart, the nursing notes in Donald Maier's medical chart contain no notation of the information provided by C.O. Russell.

4090. Additionally, Nurse Hosfelt was aware of the need to explore the extent to which Maier was missing meals, because of the potential danger to his health and because if he missed three meals, she was required to initiate the "hunger strike" protocol.

4091. After her conversation with C.O. Russell, Nurse Hosfelt subsequently walked right past Maier's cell and left Alpha Range without

stopping to assess the condition of Donald Maier or even to look into his cell to see if he was all right.

4092.  Nurse Hosfelt returned to the area of Maier's cell at approximately 10:36 a.m. that morning in the company of Sergeant John Hollfelder, Captain Scott Kinnard, and Dr. Kayla Meedema.

4093.  Dr. Meedema and Capt. Kinnard attempted contact with Donald Maier through the slot in the door of his cell and observed him through the window to his cell, but they received no verbal response from him.

4094.  Although his unresponsiveness was another clear sign that Mr. Maier was not functioning well and that he was in need of some kind of evaluation and assistance, Hollfelder, Kinnard, and Meedema moved on, without entering his cell to check on him, without performing or ordering a medical or psychological evaluation, and without having established a plan for an intervention to evaluate and assist Mr. Maier.

4095.  In spite of having been told by C.O. Russell that Maier had not eaten for two days and was drinking out of the toilet, and having observed his unresponsiveness, Nurse Hosfelt did not conduct a nursing assessment of Donald Maier.

4096.  A nursing assessment would entail, at a minimum, taking the vital signs of the patient/inmate; this cannot be performed outside a cell.

4097.  Of all the staff who were gathered around Donald Maier's cell on the morning of February 20, 2024, only RN Hosfelt was professionally trained to conduct a nursing assessment.

4098. On February 20, 2024, during the second shift, RN Hosfelt was contacted and requested to do a wellness check on Donald Maier because of C.O. Devyn Urban's concerns that Maier had had a seizure.

4099.  Sgt. Aimee Marshall, Lt. Eric Henrichs, C.O. Urban and RN Jessica Hosfelt all observed Donald Maier lying on the floor of his cell, unresponsive and shaking.

4100.  Not one of them took any action to provide the assistance he obviously needed: they did not enter his cell to check on his condition, did not perform or request a medical or psych evaluation, and did not intervene in any way to help Mr. Maier in spite of his distress which was evident to anyone who saw him.

4101.  On February 21, 2024, at 09:16, Sgt. Hollfelder, C.O. Lajuan Lewis, and RN Brian Taplin each observed Mr. Maier lying on his cell floor, naked and shaking and nonresponsive to them.

4102.  Not one of them took any action to provide the assistance he obviously needed: they did not enter his cell to check on his condition, did not perform or request a medical or psych evaluation, and did not intervene in any

way to help Mr. Maier in spite of his distress which was evident to anyone who saw him.

4103.   At a minimum, a wellness check, such as Nurse Hosfelt had been requested to perform, required a nursing assessment, which would have required Nurse Hosfelt to enter Mr. Maier's cell and take his vital signs.

4104. On February 21, 2024, psychologist Dr. Engstrom came to see Maier for an out-of-cell evaluation and was advised that Maier refused the meeting.

4105. Dr. Engstrom went to the cell where he saw Maier lying on the floor of his cell.

4106. Dr. Engstrom knew Donald Maier well since he had been his psychologist for years, and he could certainly contrast Maier's normal appearance in the recent past with the fragile and decimated figure Engstrom was observing then.

4107. Although Dr. Engstrom noted that he had concerns after observing Donald Maier's frail condition, he did nothing to help Maier: he did not enter the cell to check on Maier's condition and did not order a medical evaluation; he did nothing.

4108.   Donald Maier never got off the floor of his cell after February 21, 2025.

4109.  On February 21, 2024, at 17:03, C.O. Benjamin Nichols notified his superior officer, Sgt. Aaron Arzenhofer, that Donald Maier was not doing well.

4110.  Sgt. Arzenhofer took no action to observe Donald Maier or to help him; his only response was to tell C.O. Nichols to "keep an eye on it" and write an incident report if it continues.

4111.  On February 21, 2024, at 21:07, C.O. Nichols reported to Lt. Fisher that Maier was shaking in his cell and appeared to be having a seizure.

4112.  Lt. Fisher ignored the report of Donald Maier's condition and took no action to observe or help Mr. Maier: he did not send for medical personnel or order any intervention.

4113.  Captain Kinnard requested permission for a team of officers to perform a cell extraction in order to remove Donald Maier from his cell so he could be evaluated in person.

4114.  In spite of learning how concerning and perilous Mr. Maier's distress was, Head of Security Yana Pusich, the person from whom Captain Kinnard sought permission to remove Maier from his cell, denied Kinnard's request.

4115. On February 22, 2024, C.O. Ransbottom initialed that she had completed rounds in RHU at 02:00 and 02:30 – she had not made those rounds.

4116. On February 22, 2024, during first shift, Capt. Kinnard, C.O.'s Maria Gomez-Sena, Guillermo Avila, Leopoldo Escorza, Dustin Fay, and Robert McGuinness, and Social Worker Karisa Smits all observed Donald Maier lying on the floor of his cell, non-responsive, but none of them entered the cell to check on him.

4117. On February 22, 2024, at 14:30 and against at 15:00, Jeramie Chalker, who was a Sergeant on RHU, falsified records, attesting that he had made the required rounds of the unit at those times when he had not done so.

4118. Sgt. Chalker was ordered to fill out the records as he did by his superior officer, Captain Kinnard.

4119. On February 22, 2024, at about 15:38, Donald Maier was discovered deceased in his cell.

4120. The Dodge County Medical Examiner P.J. Schoebel and sheriff deputies came to Mr. Maier's cell about an hour after he was found dead.

4121. Upon entering Maier's cell, they noted the sight and stench of food and garbage strewn about the cell.

4122. There were food trays, bag lunches, and cartons of milk scattered around the cell.

4123. M.E. Schoebel opined that Donald Maier had died sometime in the morning of February 22, 2024.

30

4124. After completing an autopsy, the Chief Medical Examiner of Fond du Lac County, Dr. Adam Kovach, found that Donald Maier's cause of death was probable dehydration and failure to thrive due to malnutrition with hypertensive cardiovascular disease, myocardial scarring of unknown etiology, acute kidney injury, possible rhabdomyolysis, and delusional disorder as contributing factors.

4025. Donald Maier's death certificate lists the manner of his death as homicide.

4026.  During February, 2024, and before, the Department of Corrections suffered from systemic deficiencies that directly impacted the lack of care and lack of access to services that Donald Maier received.

4027. The staffing level at WCI was allowed to remain severely understaffed for many months, leading to exhaustion and lack of morale on the part of the correctional staff who were working there.

4028.  Assignment to work on RHU was one of the least desirable placements within WCI, and yet due to the staffing shortage, correctional staff who were assigned there were often required to work involuntary overtime, sometimes double shifts, and given the lack of adequate staff, they were constantly under pressure to provide more services than they could possibly provide.

4029.  This led to resentments of the part of the correctional staff, and the brunt of that resentment was directed towards the RHU inmates who were in need of the most services, the inmates who were mentally ill and therefore often difficult to deal with.

4030.  This long-term staff shortage and the overwork and resentments of the correctional staff led directly to a failure of correctional and healthcare staff to attend to the very apparent medical needs of Donald Maier.

4031.  This long-term staff shortage and the overwork and resentments of the correctional staff created an atmosphere within which, to those persons working at WCI,  it did not seem barbaric for the staff to ignore the fact that Donald Maier was not eating and was not having any water to drink and was eventually unable to communicate his needs.

4032.  The correctional staff did not receive the necessary training in the reasons for and the necessity of following the hunger strike protocol and the water shut-off protocol, and this lack of training led directly to Donald Maier's death.

4033.  Randall Hepp was the Warden of WCI during and before February, 2024, and as such, he was responsible for the operation and management of WCI.

4034. Specifically, it was his duty to, among other things, continuously monitor the progress of programs for care, custody, and treatment of inmates.

4035. It was also Warden Hepp's duty to continuously assess staff assignments to maintain optimum effectiveness, to provide for staff training and development, and to maintain responsiveness to the needs of the inmates.

4036. Warden Hepp was well aware that the understaffing, the lack of morale, and the lack of adequate training created a substantial risk that the most at-risk inmates on RHU, such as Donald Maier, were not receiving the level of care and supervision need in order to afford them adequate medical and mental health evaluation and treatment and were not receiving humane conditions of confinement, but he was deliberately indifferent to that risk.

4037. Warden Hepp was aware of a systemic lapse in enforcement of the hunger strike protocol and the water shut-off protocol, both of which were critical to ensuring inmate health and safety, but he did not take action to attempt to ensure that the protocols were adhered to.

4038. Bradley Mlodzik was the Deputy Warden of WCI during February, 2024, and as such it was his duty to conduct daily inspections to ensure that security and treatment needs are being met, identify training needs, and conduct training sessions.

4039. Deputy Warden Mlodzik was aware that the understaffing, the lack of morale, and the lack of training created a substantial risk that the most at-risk inmates on RHU, such as Donald Maier, were not receiving the level of care and

supervision to afford them adequate medical and mental health evaluation and treatment and were not receiving humane conditions of confinement, but he was deliberately indifferent to that risk.

4040. Deputy Warden Mlodzik was aware of a systemic lapse in enforcement of the hunger strike protocol and the water shut-off protocol, both of which were critical to ensuring inmate health and safety, but he did not take any action to attempt to ensure that the protocols were adhered to.

4041 In February, 2024, and before, Yana Pusich was the Security Director at WCI.

4042. In that position, she was responsible for the treatment, security and living conditions of all inmates at WCI as well as the training of correctional staff.

4043. Director Pusich was aware that the understaffing, the lack of morale, and the lack of training created a substantial risk that the most at-risk inmates on RHU, such as Donald Maier, were not receiving the level of care and supervision to afford them adequate medical and mental health evaluation and treatment and were not receiving humane conditions of confinement, but she was deliberately indifferent to that risk.

4044. Director Pusich was aware of a systemic lapse in enforcement of the hunger strike protocol and the water shut-off protocol, both of which were

34

critical to ensuring inmate health and safety, but she did not take any action to attempt to ensure that the protocols were adhered to.

4045. The Wisconsin Department of Corrections received federal funds in 2024.

4046. The Wisconsin Department of Corrections refers to prison inmates as "PIOC," which is an abbreviation for "persons in our care."

4047. Secretary Jared Hoy allowed the condition of understaffing, which was at the heart of the systemic problems at WCI, to continue unabated for many months without any reasonable response to the problem of which he was well aware.

4048. Before February 2024, Secretary Hoy was aware that the understaffing and lack of training and the resentment and lack of morale among the DOC employees was almost certain to result in inmates, such as Donald Maier, who were in the most critical need of treatment and evaluation of their needs, being denied access to mental health and medical care systems.

4049. He was also aware that the burden of this lack of staff attention and lack of access would fall most heavily on those who were least able to communicate their needs, the mentally ill inmates confined on RHU.

## V.    VIOLATIONS OF LAW

## Claims against Individual Defendants under 42 U.S.C. § 1983

501.    Each of the individual Defendants was deliberately indifferent to Donald Maier's serious medical and mental health needs and thereby violated his right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

502.    Each of the individual Defendants violated Donald Maier's right to be free from cruel and unusual punishment, guaranteed by the Eighth and Fourteenth Amendment to the United States Constitution, by deliberate indifference to the inhumane conditions of confinement, confinement in which Maier lived in filth, without human contact, and without food and water, while in Restrictive Housing Unit.

## Claim against Defendant Hoy under Rehabilitation Act

503.    Donald Maier was a qualified individual with a disability who was denied the benefits of services, activities, or programs of Waupun Correctional Institution.

504.    Secretary Hoy and the Wisconsin Department of Corrections violated Donald Maier's statutory right not to be excluded from participation in

36

or deprived of access to programs or activities of Waupun Correctional Institution when he and it failed to provide a reasonable accommodation for Mr. Maier's medical needs and his mental illness.

505.     Secretary Hoy and the Wisconsin Department of Corrections violated Donald Maier's right not to be excluded from participation in or deprived of access to programs or activities of Waupun Correctional Institution in that the DOC's policies and procedures and chronic understaffing disproportionately impacted mentally ill inmates, including Mr. Maier.

### State-Law Wrongful Death Claims

506.     As a supplemental state-law claim, the conduct of individual Defendants Randall Hepp, Alexander John Hollfelder, Jessica Ann Hosfelt, Jamall R. Russell, Jeramie Chalker, Sarah Am Ransbottom, Michael Lueneburg, Joel Sankey, Jenny Vaillancourt, Bradley Lewin, Ernesto Martinez, Nathan Shreve, Carlee Martin, Dustin Wiltgen, Scott Kinnard, Melissia Tempski, Maria Gomez-Sena, Kayla Meedema, Devyn Urban, Aimee Marshall, Eric Henrichs, Lajuan Lewis, Brian Taplin, Jaime Engstrom, Aaron Arzenhofer, Brandon Fisher, Guillermo Avila, Leopoldo Escorza, Dustin Fay, Robert McGuinness, and Karisa Smits in failing to take action to assist Donald Maier when they saw that his condition was perilous were acts of negligence, caused Mr. Maier suffering,

misery, and physical harm, and ultimately, caused the wrongful death of Donald
Maier.

507.    As a supplemental state-law claim, the conduct of individual
Defendants Randall Hepp, Alexander John Hollfelder, Jessica Ann Hosfelt,
Jamall R. Russell, Jeramie Chalker, Sarah Am Ransbottom, Michael Lueneburg,
Joel Sankey, Jenny Vaillancourt, Bradley Lewin, Ernesto Martinez, Nathan
Shreve, Carlee Martin, Dustin Wiltgen, Scott Kinnard, Melissia Tempski, Maria
Gomez-Sena, Kayla Meedema, Devyn Urban, Aimee Marshall, Eric Henrichs,
Lajuan Lewis, Brian Taplin, Jaime Engstrom, Aaron Arzenhofer, Brandon Fisher,
Guillermo Avila, Leopoldo Escorza, Dustin Fay, Robert McGuinness, and Karisa
Smits in failing to act on Maier's behalf to ensure that he received minimally
humane treatment and living conditions, were acts of negligence, caused Mr.
Maier suffering, misery, and physical harm, and ultimately, the wrongful death
of Donald Maier.

## VI.    DAMAGES AND EQUITY

601. Donald Maier was deprived of his life, and in the nine days before his
death, he endured excruciating pain, indignity, suffering, anguish, emotional
distress, all as a proximate result of the Defendants' unconstitutional and
negligent conduct, for which the Estate of Donald Maier seeks an award of
compensatory damages.

38

602.  Donald Maier was subjected to discriminatory treatment as a result of his disability for which the Estate of Donald Maier seeks an award of compensatory damages.

603.  Jeannette Maier has suffered loss of companionship when her son, Donald Maier, suffered wrongful death due to the conduct of the Defendants, for which she seeks compensatory damages.

604. Because the individual Defendants' conduct evinced reckless disregard of Donald Maier's constitutional rights, the Plaintiffs also seek punitive damages in a further amount which will serve to punish them and will serve to deter the individual Defendants and others who are similarly situated from repeating such behavior in the future.

## VII.  CONDITIONS PRECEDENT

701.    All conditions precedent to this action, within the meaning of Rule 9(c), Fed. R. Civ. Pro., have been performed or have otherwise occurred.

702.  Specifically, a Notice of Circumstances of Claim was timely and properly filed against those individual Defendants against whom the Plaintiffs assert state law negligence claims.

## VIII.  DEMAND FOR JURY TRIAL

801.    The Plaintiffs hereby demand a trial by jury of all issues triable of right to a jury.

## IX. PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that the Court grant judgment against

the Defendants, awarding them:

901. Monetary damages in an amount that will fairly compensate the

Plaintiffs for these injuries;

902. Costs, attorneys' fees and litigation expenses as well as any further

relief this Court deems just.

Dated this 28th day of April, 2025

Respectfully submitted,

Estate of Donald Maier, by Personal
Representative Jeannette Maier, and
Jeanette Maier, Plaintiffs

By

THE JEFF SCOTT OLSON LAW FIRM, S. C.
ATTORNEYS FOR PLAINTIFF
Jeff Scott Olson
State Bar Number 1016284
Andrea J. Farrell
State Bar Number 1064773
1025 Quinn Drive, Suite 500
Waunakee, Wisconsin 53597
Phone    (608) 283-6001
Fax        (608) 283-0945
Email     JSOlson@scofflaw.com

40

/s/ Jeff Scott Olson

_____

Jeff Scott Olson